*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

## OPINION

No. 04-07-00616-CR

Ted H. **ROBERTS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-6404B
Honorable Sid L. Harle, Judge Presiding

Opinion by:　Alma L. López, Chief Justice

Sitting:　　　Alma L. López, Chief Justice
　　　　　　Karen Angelini, Justice
　　　　　　Sandee Bryan Marion, Justice

Delivered and Filed:　October 8, 2008

AFFIRMED

A jury found Ted H. Roberts guilty of three counts of theft, and the trial court assessed a punishment of five years imprisonment. Roberts presents five issues on appeal contending: (1) the trial court erred in denying his motion for new trial because his conduct was lawful; (2) section 31.03 of the Texas Penal Code is unconstitutionally vague and overbroad as applied; (3) the evidence supported his defense of mistake of law; (4) the trial court erred in failing to quash the indictments

because they failed to allege conduct or facts constituting an offense; and (5) the evidence is legally and factually insufficient to support his conviction.  We affirm the trial court's judgment.

## BACKGROUND

Christi Treviño began working as a receptionist at Roberts's law firm in July of 1999.  In 2001, Roberts informed Treviño that his wife, Mary, had engaged in an affair.  Treviño stated that after Roberts learned of his wife's affairs, "he [planned] to meet with all the people that she had an affair with and present them with documents asking for money."  Roberts had a key made to one of the offices at his law firm.  Only Roberts and Treviño had access to the office which was to be used exclusively to "work on documents related to the affairs."  Treviño worked on the documents from the end of October, when Roberts told her about the affairs, until November, when Mary was given access to the office.  After Mary was given access, Treviño was no longer required to work on those documents.  Treviño testified that Roberts did not bring in extra attorneys to help with the law firm during this period of time, and neither Sherry Gonzales nor Barbara Hutzler worked for Roberts while Treviño worked at the law firm.  At one point, Treviño was instructed to contact the CPA firm of one of the men with whom Mary had an affair to schedule an appointment under a false name because Roberts wanted the man to be surprised when he showed up.  Treviño also identified a list that Roberts prepared of the "things he wanted to obtain" from each of the persons with whom his wife had an affair.

In October of 2001, Roberts contacted Allan Harvison, a private investigator with Security Management International ("SMI"), requesting computer forensic work.  Harvison contacted David Getrost, who performed the computer forensic work for SMI.  Roberts informed Harvison, his partner Ron Oling, and Getrost that he believed his wife was having an affair and wanted to obtain

information from her computer to confirm his belief. When Harvison subsequently met with Roberts to provide him with the information recovered from the computer, Roberts told Harvison, "These individuals are going to contribute to my favorite charity: Me." Harvison heard that Getrost witnessed Roberts break down and cry upon receiving more of the information that was retrieved.

Getrost removed a hard drive from a computer at Roberts's home and returned a copy of the hard drive to the computer the following day before Mary returned home. Over the next few weeks, Getrost removed information from the hard drive that either he, Oling or Harvison delivered to Roberts. Getrost stated that when he delivered some of the information, Roberts became upset and cried. During another meeting, Getrost testified that Roberts made the following comment:

> that he was going to use his wife's accounts and contact some of these people that I had found this information on and set up meetings posing as her at hotels and when they showed up, he was going to be sitting there on the bed smoking a big fat cigar, and when they walked in, he said he was going to ask them if they brought their checkbook because they were going to write a healthy check to his favorite charity, his kids, and then he laughed.

Getrost thought Roberts was just blowing off steam. Getrost recalled that Roberts might have said the men would write the check or he would go to the news. On cross-examination, Getrost could not recall which meeting he described occurred first, but his written statement recounted that the meeting where Roberts cried occurred after the meeting where he made the comment.

Paul James Fitzgerald, an accountant, had an affair with Mary that began in early August of 2001 and ended in September of 2001. Fitzgerald knew that Mary was married to Roberts and that Roberts practiced law with a person named West. Subsequently, Fitzgerald received a telephone message from a Dr. West for a tax appointment. Fitzgerald thought the message was unusual and recognized the name from Roberts's law firm. Roberts subsequently contacted Fitzgerald to set up a meeting to discuss Fitzgerald's relationship with Mary.

Roberts eventually met with Fitzgerald and told him how distraught and emotionally upset he was in finding out about the affair and that he had to hire other attorneys to assist him because he was unable to work. Fitzgerald apologized to Roberts and asked if they could just move forward, but Roberts told him that he needed to suffer for what he did by paying him some money. Roberts stated that his own penance would be to make a sizable donation to a children's foundation he was establishing.

Roberts either handed Fitzgerald a petition at the meeting or sent the petition to Fitzgerald the following day. The petition was drafted based on Rule 202 of the Texas Rules of Civil Procedure and was requesting the court's permission to investigate claims.[1] The petition had a copy of various highlighted sections of the Texas Penal Code attached which made Fitzgerald think that he had unknowingly committed a crime. This was significant to Fitzgerald because he could potentially lose his CPA license. The petition also mentioned the possibility of deposing Fitzgerald's wife and obtaining access to the hard drives of all his business and personal computers which would be damaging because his computers contained client information. Roberts demanded $25,000 from Fitzgerald, and Fitzgerald ultimately agreed to pay $15,000. Fitzgerald gave Roberts three checks totaling $15,000 on November 21, 2001. One check was to SMI to cover the cost of having Mary's computer analyzed, and two checks were to attorneys who allegedly assisted Roberts with his case load when he was too distressed to work. At that time, Fitzgerald did not have an attorney. After Fitzgerald handed Roberts the checks, Roberts stood up with a very large grin on his face and took out a large cigar. Although Fitzgerald considered stopping payment on the checks, he could not risk

---

[1] Rule 202.1 provides, "A person may petition the court for an order authorizing the taking of a deposition or oral examination or written questions ... to investigate a potential claim or suit." TEX. R. CIV. P. 202.1(b).

the actions that were mentioned in the petition. Roberts never mentioned to Fitzgerald that Mary was having affairs with at least four other men.

Geoffrey Ferguson, a lawyer, had an affair with Mary in August of 2001. Mary subsequently contacted Ferguson and told him Roberts knew something had happened. Roberts later contacted Ferguson and told him they needed to meet. In November of 2001, Mary contacted Ferguson to meet with her prior to his meeting with Roberts. Mary told Ferguson that Roberts had found out that she had another boyfriend, and the situation had been difficult on their children. At their meeting, Roberts handed Ferguson an envelope with a Rule 202 petition which Ferguson stated he would review later. Roberts referenced e-mails Mary exchanged with Ferguson while Roberts and Mary were on vacation in California. Roberts mentioned that he was getting counseling. Roberts told Ferguson that he was upset and needed to be made whole referring to expenses relating to the vacation and counseling. Roberts did not tell Ferguson that he had been in counseling for some time, not just since the affairs. Ferguson was given the impression that the counseling was triggered by his relationship with Mary. Roberts insinuated that if the petition was filed, Ferguson's wife would learn of the affair. When Ferguson later reviewed the petition, it appeared that Roberts wanted to investigate whether Ferguson had committed various crimes resulting from the affair. The petition also mentioned investigating Ferguson's law firm accounts. The petition listed Mary as a person with an adverse interest to Roberts, but Ferguson was not informed that Roberts and Mary had recently paid earnest money to purchase a new $625,000 home.

Several weeks later, Roberts met with Ferguson and requested $30,000. Roberts told Ferguson that his children were acting out in school and needed their own counseling in addition to his and Mary's counseling. Roberts did not mention that he was asking other men with whom Mary

had affairs to pay for the same expenses he was requesting that Ferguson pay. Roberts said he had been unable to work and hired outside attorneys to help him. Roberts asked if Ferguson wanted to pay a foundation of which he was trustee the $30,000 or make the interest payment on his house for several months. Roberts told Ferguson he was the trustee of a children's foundation. Ferguson gave Roberts a check payable to "Ted H. Roberts, PC, Trustee." Ferguson testified that he would not have been willing to pay the money if he knew that Mary had two other affairs that were not disclosed to him or if those other men were being asked to pay the same expenses.

Steven Riebel, the chief financial officer of a company, had an affair with Mary in the summer of 2001. Riebel exchanged e-mails with Mary while she was in California on vacation with Roberts. Mary subsequently called Riebel and told him Roberts had discovered their relationship. Mary did not tell Riebel that she was having affairs with other men also. Riebel told her to make amends with her husband. Riebel told his wife, and they started counseling. Mary called Riebel and informed him that Roberts was investigating him and other men with whom Riebel started a company and that she was unsure how Roberts was going to use the information. Mary did not tell Riebel that Roberts also was investigating her other affairs. Mary called a third time and told Riebel that Roberts was investigating his current employer and that Roberts would be sending him some legal papers. A few days later, on November 12, 2001, Mary delivered the legal papers. The petition requested permission to investigate the company Riebel had started with other businessmen and his employer, including his employer's SEC filings. The petition listed numerous shareholders and officers of the companies as persons with adverse interests. Riebel believed that public disclosure of the contents of the allegations would be embarrassing and would cause people to lose confidence

in him. Riebel feared that he would be terminated if the information was disclosed. Riebel met with an attorney who advised him that Roberts could proceed with the petition.

Riebel's attorney set up a meeting with Roberts in December of 2001. Prior to the meeting, Roberts sent a written list of expenses for which he was seeking reimbursement, including SMI's forensic computer investigation, his vacation to California, retainers for two attorneys who allegedly assisted in his practice, loss on sale of a vehicle in which Riebel and Mary had relations, and fees for psychologists. Riebel was unaware that Mary also had affairs with other men or that those men had paid for the same expenses for which Roberts was seeking reimbursement from Riebel. Other than paying for the expenses, Riebel's attorney stated that Riebel was unwilling to pay the additional amounts demanded. Roberts stated that he and Riebel had a similar interest in children and that Roberts was intending to set up a charity for children in broken home situations. Roberts represented that the charity's money was to be used for daycare and those types of expenses. When Riebel told Roberts he wanted time to consider whether to contribute the additional amount demanded for the charity, Roberts informed him that he had five minutes to make a decision before Roberts decided what he intended to do with the legal papers. Roberts informed Riebel's attorney that he wanted reimbursement for $30,000 in expenses and a $70,000 contribution to the charity. Riebel agreed to make the payment on the condition that Roberts provided documentation that the charity was established with 501(c)(3) status by March of 2002. Riebel stated he would not have made the contribution if it was not to be used for its intended purpose, and he was never informed that the money was used by Roberts personally.

Reagan Sakai, a chief financial officer for a software company, had a sexual encounter with Mary in late summer of 2001 at a hotel in Austin. Mary subsequently contacted Sakai requesting

to meet him for drinks at the Austin hotel. While Sakai was sitting at the hotel bar, Roberts approached him and made a comment about the company for which Sakai worked. When Sakai ignored Roberts, Roberts introduced himself as Mary's husband and handed Sakai some papers saying he needed to take them very seriously. Roberts left the bar after saying, "Research it. I've got you." After reading the papers, Sakai believed Roberts intended to file the papers in court and believed he could lose his job, his livelihood, and his family. Sakai believed the papers contained a hodge-podge of legal claims, including allegations that he had committed crimes. The petition also listed the other officers of Sakai's employer. When Sakai asked to meet Roberts, Roberts came down from his hotel room with a cigar in his mouth and said he would contact Sakai at a future date. During subsequent conversations, Sakai believed they had settled on a $10,000 payment; however, Roberts sent a letter demanding a $15,000 payment. Sakai stated that he was paying the money as "hush money" because he "was being shaken down." Sakai's attorney also advised him that he was being "shaken down" and would not be surprised if there were others involved. Sakai met with Roberts, and a final settlement for $10,000 was reached. Although Sakai made the check payable to a foundation, he did not care where the money went. He intended to pay $10,000 for the confidentiality agreement and to prevent the petition from being filed.

Chance Collins, a Texas Ranger, was instructed to contact an investigator at the district attorney's office to assist in investigating a criminal case against Roberts and Mary based on information published in a newspaper article. Collins contacted C.J. Havrda and began reviewing boxes of information. Collins tracked the payments made to Roberts by Sakai, Riebel, Fitzgerald and Ferguson. Ferguson's check dated December 17, 2001, for $30,000 was deposited into Roberts's law firm account. Riebel's check dated December 18, 2001, for $30,000 was deposited into

Roberts's law firm account on December 19, 2001. Also on December 19, 2001, a $93,000 withdrawal was made on that account to pay the down payment on the new home purchased by Roberts and Mary. Fitzgerald wrote three checks - one to SMI for $5,000, one to Sherry Gonzalez for $5,000, and one for $5,000 to Barbara Hutzler. Sakai's check dated December 21, 2001, for $10,000 was payable to the Genesis Foundation for Children and was deposited into a Compass Bank account established for the Roberts Foundation for Children. Similarly, Riebel's check dated March 29, 2002, for $70,000 was payable to the Roberts Foundation for Children and was deposited into a Fidelity Investments account established for the Roberts Foundation for Children. In June of 2002, $50,000 was withdrawn from this account and deposited into Roberts's law firm account.

Broadus Spivey testified that the use of Rule 202 petitions is common and lawful and is used as an investigative tool. Spivey testified that the Rule 202 petitions prepared by Roberts demonstrate the state of the law in 2001 for the claims asserted, including the claim for intentional infliction of emotional distress and respondeat superior allegations. Spivey testified that Roberts's decision not to file the Rule 202 petitions did not mean he misrepresented his intent to file them before the settlements were reached. Spivey testified that the petitions did not contain accusations, just requests to investigate potential claims.

## MOTION FOR NEW TRIAL

In his first issue, Roberts contends the trial court erred in denying his motion for new trial because the conduct in which he engaged was lawful. Roberts devotes sixteen pages of his brief to assert a myriad of reasons why he believes his conduct was lawful.

A.       Standard of Review

We review a trial court's ruling on a motion for new trial under an abuse of discretion standard of review. *Webb v. State*, 232 S.W.3d 109, 110 (Tex. Crim. App. 2007); *Garcia v. State*, 246 S.W.3d 121, 147 (Tex. App.—San Antonio 2007, pet. ref'd). Under this standard of review, we view the evidence in the light most favorable to the trial court's ruling and uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Webb*, 232 S.W.3d at 110; *Garcia*, 246 S.W.3d at 147. We do not substitute our judgment for that of the trial court but instead consider whether the trial court's decision was arbitrary or unreasonable. *Webb*, 232 S.W.3d at 110; *Garcia*, 246 S.W.3d at 147. Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Webb*, 232 S.W.3d at 110; *Garcia*, 246 S.W.3d at 147-48.

B.       Definition of "Unlawful"

Roberts first focuses on the definition of "unlawful" to assert his conduct did not meet the definition. Section 31.03(a) provides that a person commits the offense of theft if he "unlawfully appropriates property with intent to deprive the owner of property." TEX. PEN. CODE ANN. § 31.03(a) (Vernon Supp. 2008). Roberts notes that the term "unlawful" is defined by the Texas Penal Code as "criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to privilege or justification." TEX. PEN. CODE ANN. 1.07(a)(48) (Vernon Supp. 2008). Applying this definition, Roberts asserts that his conduct was lawful because it was not criminal or tortious.

Although section 31.03(a) uses the term "unlawfully" in defining the elements of the offense, section 31.03(b) specifically defines when the appropriation of property is "unlawful" in relation to

the offense of theft. TEX. PEN. CODE ANN. § 31.03(b) (Vernon Supp. 2008). The appropriation of property is "unlawful" when it is without the owner's effective consent. *Id*. Therefore, the State was not required to generally prove that Roberts's conduct was criminal or tortious. Instead, the State was required to establish that Roberts appropriated property without the owner's effective consent. If the evidence established the absence of the owner's effective consent, then Roberts's appropriation of the property was "unlawful" under section 31.03(b). We will address how the evidence established the absence of the owner's effective consent in our discussion of Roberts's sufficiency point.

## C. Criminal Use of Rule 202 Petitions and Privileged Communications

Roberts cites numerous civil cases to contend that his use of the Rule 202 petitions in threatening to file a lawsuit did not constitute duress but was lawful regardless of the validity of the claims he was asserting. The State responds that conduct involving a lawsuit can be criminal, and the civil case law has no application to this case.

Roberts's reliance on civil cases holding that the threat of a lawsuit does not constitute duress is misplaced. *Cf. Wright v. State*, No. 14-99-00042-CR, 2001 WL 253468, at *5 (Tex. App.—Houston [14th Dist.] Mar. 15, 2001, no pet.) (questioning whether statement from civil case regarding consent applies to criminal jurisprudence) (not designated for publication); *Jenkins v. State*, No. 07-97-0021-CR, 1997 WL 746223, at *3 (Tex. App.—Amarillo Dec. 3, 1997, pet. ref'd) (rejecting assertion that proceeding should be civil in nature, not criminal, because complainants took actions without undue duress, threat, or fraud) (not designated for publication). Those decisions were rendered in civil cases in which the plaintiffs sought to recover damages. Those decisions do not apply and are not instructive with regard to whether Roberts's actions constituted a criminal

offense. The considerations are different. The civil case law controls in determining whether a plaintiff will be entitled to recover damages for tortious actions. The criminal statutes and the definitions contained therein govern whether a defendant's actions constitute a criminal offense.

Roberts also cites two cases that support the proposition that written or oral communications made in the due course of a judicial proceeding are absolutely privileged and cannot serve as the basis for an action for defamation. *Ross v. Heard*, No. 04-04-00110-CV, 2005 WL 357032, at *2 (Tex. App.—San Antonio Feb. 16, 2005, no pet.) (mem. op.); *Watson v. Kaminski*, 51 S.W.3d 825, 827-28 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Roberts relies on the holdings in these civil cases to assert that because his communications were privileged, he cannot be criminally prosecuted. Roberts cites no case law to support the contention that the State cannot criminally prosecute him for his use of the Rule 202 petitions in a manner that violated the criminal statutes. Moreover, we know that oral communications during the course of a judicial proceeding can give rise to criminal charges, most notably perjury.

D.      Settlement Contracts

Roberts further asserts that the settlement contracts were legally valid and preclude a finding of unlawful deception. Although contractual arrangements are generally considered a civil matter and breaches are typically civil matters involving damages, conduct involving contractual arrangements can result in criminal charges in certain circumstances depending on the nature of the actions taken. *See Wright*, 2001 WL 253468, at *5-6.; *see also Caldwell v. State*, No. 14-01-00774-CR, 2003 WL 21982148, at *2-4 (Tex. App.—Houston [14th Dist.] Aug. 21, 2003, pet. ref'd) (finding evidence sufficient to support theft by deception conviction for actions taken involving investment) (not designated for publication); *but see Jacobs v. State*, 230 S.W.3d 225, 232 (Tex.

App.—Houston [14th Dist.] 2006, no pet.) (reversing conviction where evidence showed only civil contract dispute and not criminal intent necessary to support conviction).

Roberts contends that the release contained in the settlement agreements signed by each of the complainants bars his prosecution. A release between private individuals does not bar the State from prosecuting a criminal offense. A private individual cannot offer immunity from prosecution through a contractual arrangement not involving the State. *See Smith v. State*, 70 S.W.3d 848, 85-51 (Tex. Crim. App. 2002) (noting grant of immunity has to be requested by district attorney and approved by trial court).

E.      Conclusion

Roberts urges this court to consider the effect his conviction will have on the future use of Rule 202 petitions. Roberts contends that Rule 202 petitions necessarily involve the use of threats. During oral argument, Roberts's attorney conceded that Roberts's conduct would be criminal if undertaken in the absence of the Rule 202 petitions. We fail to see how Roberts's use of his law license to draft Rule 202 petitions in his efforts to get the men to "contribute to his favorite charity: me" converts criminal extortion into lawful conduct. Rule 202 petitions are intended to be used for legitimate investigatory purposes, and their continued use by attorneys for this purpose will not be affected by our affirmance of Roberts's conviction. The jury did not believe that Roberts's intent in drafting the Rule 202 petitions was to investigate a potential claim or suit. Instead, the jury found that Roberts's intent was to coerce the men or create a false impression of law or fact, which is supported by Roberts's attachment of highlighted definitions from the Texas Penal Code which gave the impression that the men were criminally liable as a result of their affairs. Our decision that Rule

202 petitions when used in this manner is unlawful conduct will have no effect on the legitimate use of Rule 202 petitions in the future.

**CONSTITUTIONALITY OF SECTION 31.03**

In his second issue, Roberts asserts that section 31.03 of the Texas Penal Code is unconstitutionally overbroad and vague.

A.      Standard of Review

In determining whether a law is vague and/or overbroad, the elementary principle of statutory construction requires us to interpret a statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results. *Sanchez v. State*, 995 S.W.2d 677, 683 (Tex. Crim. App. 1999); *Duncantell v. State*, 230 S.W.3d 835, 842-43 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). In determining a statute's plain language, words and phrases shall be read in context and construed according to the rules of grammar and usage. *Sanchez*, 995 S.W.2d at 683; *Duncantell*, 230 S.W.3d at 843. We begin our review of the constitutionality of a statute with the presumption that the statute is valid and that the legislature did not act arbitrarily and unreasonably in enacting the statute. *Duncantell*, 230 S.W.3d at 843. We must uphold a statute if we can determine a reasonable construction that will render it constitutional. *Id*. When an appellant challenges a statute as both unconstitutionally overbroad and vague, we address the overbreadth challenge first. *Id*.

B.      Section 31.03 is Not Unconstitutionally Overbroad

A statute is impermissibly overbroad if, in addition to proscribing activities that may be constitutionally prohibited, it sweeps within its coverage speech or conduct protected by the First Amendment. *Id*. Section 31.03 provides that the appropriation of property is unlawful if it is

without the owner's effective consent. TEX. PEN. CODE ANN. § 31.03(b)(1) (Vernon Supp. 2008). Section 31.01 provides that consent is not effective if it is induced by deception or coercion. *Id*. at § 31.01(3)(A). The offense proscribed in the instant case is in many ways similar to bribery or extortion. *See Sanchez*, 995 S.W.2d at 687. Bribery and extortion, while involving "speech," are not protected by the First Amendment. *Id*. Threats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal. *Id*. Accordingly, the type of speech prohibited by section 31.03 is not within the nature of speech protected by the First Amendment; therefore, the statute is not unconstitutionally overbroad.

C.      Section 31.03 is Not Unconstitutionally Vague

A statute will be declared unconstitutionally vague if its prohibitions are not clearly defined. *Duncantell*, 230 S.W.3d at 844. The vagueness doctrine is not, however, designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. *Id*. A two-part inquiry is applied in examining a criminal statute for vagueness. *Id*. First, we review the statute to determine whether an ordinary law-abiding person receives sufficient information from the statute that his conduct risks violating the criminal law. *Id*. A criminal statute need not be mathematically precise; it need only give fair warning, in light of common understanding and practices. *Id*. at 845. A statute is unconstitutionally vague when no core of prohibited activity is defined. *Id*. Second, we determine whether the statute provides sufficient notice to law enforcement personnel to prevent arbitrary or discriminatory enforcement. *Id*. A statute must be sufficiently definite to avoid the possibility of arbitrary and erratic arrests and convictions. *Id*.

Roberts relies principally on the Waco court's decision in *State v. Hanson*, 793 S.W.2d 270 (Tex. App.—Waco 1990, no pet.), to support his contention that section 31.03 is unconstitutionally vague. In that case, however, the court found the coercion of a public servant statute unconstitutional because it failed to delineate whether the term "threat" encompassed a threat of lawful action or a threat of unlawful action. *See Board v. State*, No. 03-96-00024-CR, 1998 WL 271043, at *6 (Tex. App.—Austin May 29, 1998, pet. ref'd) (not designated for publication). Moreover, *Hanson* dealt with another manner of coercion specified by a former version of the statute- to unlawfully take or withhold action as a public servant. *See Tobias v. State*, 884 S.W.2d 571, 583 (Tex. App.—Fort Worth 1994, pet. ref'd). In this case, coercion is statutorily defined, in pertinent part, as threats that expose a person to hatred, contempt or ridicule or that harm the credit or business repute of any person. TEX. PEN. CODE ANN. § 1.07(a)(9)(D), (E) (Vernon Supp. 2008). Read in context, the statute is not so indefinite that people of common understanding would be required to guess at its understanding or that would lead to arbitrary and erratic arrest and convictions. *Board*, 1998 WL 271043, at *6. To require further definition of the term "coerce" would reach the point of defining definitions. *Id*. Similarly, the term "deception" is also adequately defined by section 31.01(a) of the Texas Penal Code. *See Martinez v. State*, No. 14-98-01168-CR, 2000 WL 987121, at *2 (Tex. App.—Houston [14th Dist.] Jul. 13, 2000, pet. ref'd) (not designated for publication).

### MOTION TO QUASH INDICTMENT

In his fourth issue, Roberts asserts that the indictment failed to allege conduct or facts constituting an offense. Specifically, Roberts contends that the indictment failed to provide adequate notice of what facts constituted criminal conduct, but instead merely tracked the language of the

statute and provided the names of the complainants. The sufficiency of an indictment is a question of law which we review *de novo*. *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

The indictment in this case charged Roberts with theft by deception and theft by coercion, tracking the language of section 31.03(a) and detailing the statutory definitions of "coercion" and "deception" Roberts was charged with violating. In most cases, an indictment is sufficient if it delineates the penal statute in question. *Moff*, 154 S.W.3d at 602. An exception to this general rule was noted in *Moff*, where the defendant was charged with intentional, knowing and reckless misapplication of fiduciary property over a seven year period of time. 154 S.W.3d at 600. In that case, the Texas Court of Criminal Appeals held the trial court did not err in granting a motion to quash to require the State to specify which transactions were made without authorization during the seven-year period. *Id*. at 603. The court noted the accused has the right to notice that is specific enough to allow him to investigate the allegations against him and establish a defense. *Id*. at 602. The court held, "It is unreasonable to require the defendant to gather evidence and prepare a defense for each of the credit card and cash transactions he made during the seven-year time frame in the indictment." *Id*. at 603. The court further stated, however, "This is not to say that the State must lay out its case in the indictment, only that the defendant must be informed of the specific transactions that allegedly violate the statute." *Id*.

Unlike *Moff*, the indictment in this case provided Roberts with notice that was specific enough to allow him to investigate the allegations against him and establish a defense. By providing Roberts with the names of the complainants and charging Roberts with the specific definitions of "coercion" and "deception" he allegedly violated, Roberts was sufficiently informed of the specific actions that allegedly violated the statute. Each of the questions posed in Roberts's brief as being

unanswered by the indictment relate to evidentiary facts that the State is not required to allege in the indictment. *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998). Moreover, requiring an indictment to answer each of these questions would require the State to "lay out its case in the indictment" which it is not required to do. *Moff*, 154 S.W.3d at 603.

Even assuming the indictment was held insufficient on its face, reversal would be required only if, in the context of the case, the lack of notice had a sufficient impact on Roberts's ability to prepare a defense. *Adams v. State*, 707 S.W.2d 900, 903 (Tex. Crim. App. 1986). Roberts does not even address in his brief how the indictment's failure to answer the questions posed in his brief hindered his defense. In fact, most of the issues presented by Roberts on appeal relate to whether his conduct was criminal, not his ignorance of the nature of his conduct giving rise to the criminal charges. As the State notes, Roberts was given access to the grand jury transcripts and had actual knowledge of the conduct the grand jury considered in returning the indictment.

## SUFFICIENCY OF THE EVIDENCE

In determining the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). In conducting a factual sufficiency review, this court views all of the evidence in a neutral light and sets aside the verdict only if: (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust; or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). "[D]ue deference must be accorded the fact finder's determinations, particularly those determinations concerning the weight and credibility of the evidence," and a

reviewing court's disagreement "with the fact finder's determination is appropriate only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." Id. at 9.

The jury was charged to return a finding of guilt if Roberts unlawfully appropriated property from the complainants without their effective consent either by deception or coercion. The jury found Roberts guilty of unlawfully appropriating property from Ferguson and Riebel and of unlawfully appropriating property from all the complainants in an aggregate amount of $100,000.

Deception was defined in the charge as creating or confirming by word or conduct a false impression of law or fact that is likely to affect the judgment of another in a transaction and that the actor does not believe to be true. Deception was also defined as failing to correct a false impression of law or fact that is likely to affect the judgment of another in a transaction that the actor previously created or confirmed by words or conduct and that the actor does not now believe to be true.

With regard to Ferguson, Roberts created the false impression that the counseling he was undertaking was triggered by Ferguson's relationship with Mary and was not informed that Roberts had been in counseling for some time, not just since the affair. Roberts also created the false impression that he had been unable to work and hired outside attorneys to help him; however, Treviño testified that no such outside attorneys had been hired. Ferguson testified that he would not have been willing to pay the money if he had known that Mary had two other affairs that were not disclosed to him or if those other men were being asked to pay the same expenses. Roberts also created the false impression that he was the trustee of an existing children's foundation. Finally, Roberts created the false impression that Ferguson's check would be used by the foundation but instead deposited the check into his law firm's account.

With regard to Riebel, Roberts created the false impression that Riebel was the only person paying the expenses Roberts sought to have reimbursed as a result of his affair. Riebel was not informed that Mary had other affairs. Roberts also created the false impression that he was intending to set up a charity for children in broken home situations, and the charity's money would be used for daycare and those types of expenses. The jury could infer from the subsequent use of the funds that Roberts never intended to use the money for charitable purposes. Finally, Roberts created the false impression that he had been unable to work because of the affair and retained other attorneys to perform work for him.

Coercion was defined in the jury charge as a threat to accuse a person of any offense, expose a person to hatred, contempt or ridicule, or to harm the credit or business repute of any person. Ferguson believed the petition was charging him with various crimes resulting from the affair. Ferguson testified the disclosure of the information could possibly affect his clients. Riebel testified that public disclosure of the information contained in the petition would be embarrassing and would cause people to lose confidence in him. Riebel feared that he would be terminated if the information was disclosed. Furthermore, when Riebel requested time to consider whether to contribute to the charity, Roberts threatened that action would be taken if a decision was not made in five minutes.

The evidence is legally and factually sufficient to support Roberts's conviction.

### MISTAKE OF LAW

In conducting a factual review of an affirmative defense, the proper standard for review is, whether after considering all the evidence relevant to appellant's affirmative defense the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Bigby*

*v. State*, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994). At trial, Roberts had both the burden of production of evidence and the burden of persuasion for his affirmative defense. *Id*.

The jury was instructed that an affirmative defense to a prosecution for a crime existed if the defendant reasonably believed the conduct charged did not constitute a crime and that the defendant acted in reasonable reliance upon a written interpretation of the law contained in an opinion of a court of record. Evidence was presented that Roberts was not acting in reasonable reliance on the law in pursuing the Rule 202 petitions. Treviño testified that Roberts was seeking vengeance. Getrost testified that Roberts stated his intent to make the man pay. Harvison testified that Roberts stated his intent to make the men contribute to his favorite charity: me. Therefore, the jury could have believed that Roberts pursued the Rule 202 petitions not based on his reliance on the validity of his legal claims but in an effort to threaten and deceive the men. The jury's finding is bolstered by Roberts's reliance on definitions he copied from the Penal Code, highlighted, and attached to the petition that were not even actual offenses.

## CONCLUSION

The judgment of the trial court is affirmed.

Alma L. López, Chief Justice

PUBLISH