*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*

★ ★ ★  ★ ★ ★

## OPINION

No. 04-09-00017-CR

Mary S. **ROBERTS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 226th Judicial District Court, Bexar County, Texas
Trial Court No. 2006-CR-6404A
Honorable Sid L. Harle, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Sandee Bryan Marion, Justice
Rebecca Simmons, Justice
Marialyn Barnard, Justice

Delivered and Filed: March 17, 2010

AFFIRMED

A jury found appellant, Mary Roberts, guilty on five counts of theft by coercion or deception,

and assessed punishment at ten years' confinement, to run concurrently on all counts. The sentence

was suspended, and appellant was placed on ten years' community supervision. On appeal, appellant

contends (1) the evidence is legally and factually insufficient to support the verdict, (2) the evidence

establishes her affirmative defense of mistake of law, (3) the trial court failed to properly instruct the

jury on any defensive issues, (4) the indictment failed to allege conduct or facts that constitute an

offense, and (5) the Texas theft statute is unconstitutionally vague and overly broad both on its face and as applied. We affirm.

## BACKGROUND

Between April and September 2000, appellant discovered emails that indicated her husband, Ted Roberts, was having a relationship with someone. In 2000, appellant, individually and with Ted, underwent counseling. In July 2001, appellant discovered Ted perusing an adult internet website. Sometime later in 2001, appellant created her own profile on two adult websites, which indicated she was a professional woman, without enough sex in her life, she was discreet, and enjoyed, among other things, "great sex." She said she set up the profiles hoping to catch Ted. Although she did not believe Ted responded to her profile, other men did. Over an eight week period, between August and October 2001, appellant met with and had sexual relations with Paul Fitzgerald, Reagan Sakai, Geoffrey Ferguson, and Steve Riebel, all of whom are the complainants in the underlying criminal proceeding.

Appellant testified that, in 2001, her marriage to Ted was "basically dead," but she did not want a divorce, although Ted wanted a divorce as early as May 2001. She admitted that, on October 24, 2001, which was the night before she went to Austin for a seminar, she had sexual intercourse with Ted. The evening of the next day, Ted came to Austin, met her at her hotel, and confronted her about her emails to other men.

At some point, Ted drafted four petitions pursuant to Texas Rule of Civil Procedure 202 ("the Rule 202 Petitions"), seeking "testimony and evidence relevant to potential claims against" each separate complainant and appellant. Although there are some minor differences between the petitions, they are substantially similar in that the petitions all allege an intention to investigate

adultery as a possible ground for divorce; whether violations of the Texas Penal Code constituted negligence per se; and whether use of the equipment, facilities, and/or funds of the complainants' companies created a cause of action under the doctrine of respondent superior, law of agency, or law of negligent supervision. Each petition listed as "persons with adverse interest entitled to notice," the complainant, his wife, and in the case of two of the complainants, principals of the complainants' companies. The petitions also stated specific details of the sexual relations between appellant and the men.

Appellant said it was Ted's idea to proceed with the petitions, she did not help Ted research the petitions, and it never occurred to her that the petitions to investigate could be perceived as criminal. She also said she was against the petitions because she felt "it didn't address the fundamental problem, which was the problem in the marriage." However, she also believed the petition to investigate one of the men was part of the "healing process" for her own family. Appellant, who is an attorney, said she was familiar with Rule 202, but she was embarrassed and humiliated by the contents of the petitions. Appellant stated it was typical of Ted to pursue a legal remedy when he perceived a wrong. She admitted she typed revisions to portions of the petitions because Ted did not know word processing and she was embarrassed to have someone else in Ted's office read the petitions.

Geoffrey Ferguson, who is married and an attorney licensed in Texas, testified for the State as follows. He had known appellant for several years and they got reacquainted at a legal seminar. They met once in August 2001,[1] while appellant stayed at the Driskill Hotel in Austin, and again on

---

[1] The State introduced evidence showing appellant stayed at the Driskill Hotel in Austin August 21 through August 24, 2001.

October 25, 2001.  Although appellant stayed at the Hyatt Regency on the night of October 25, 2001,[2] they met during the day of October 25 at another hotel where Ferguson had booked a room for them.  They only kissed during their August 2001 meeting, and had sexual relations during their October 2001 encounter.  From August 2001 until their second meeting in October 2001, they corresponded by email.  On October 26, 2001, as appellant was driving home from Austin, she received a telephone call from Ferguson.  She told him Ted had seen their email correspondence, Ted knew about the affair, and Ted was upset and wanted to meet with him.  Later, Ted also called Ferguson to say he wanted to meet, but no date or time for the meeting was set.  About a week later, appellant called Ferguson to set up a meeting between him and Ted for November 28, 2001.

On November 28, 2001, appellant met with Ferguson before Ferguson's meeting with Ted.  Ferguson did not know why appellant wanted to meet with him, and he speculated Ted wanted her to gauge his reaction.  At the meeting, appellant assured Ferguson that Ted would not get into specifics and he just wanted to talk.  Ferguson testified appellant said she told Ted that she and Ferguson only kissed and she did not tell Ted they had sexual relations.  At some point during their meeting, appellant received a telephone call, which left her "sobbing" and "distraught."  About thirty minutes later, Ferguson and Ted had their meeting.  Ferguson said Ted wanted him to know he had printed the emails and he was "terribly disappointed."  Ted gave him an envelope that contained a Rule 202 Petition,[3] copies of emails, and "copies of some law."  Ted told Ferguson he was really

---

[2]⬆ The State introduced evidence showing appellant stayed at the Hyatt Regency in Austin for one night, on October 25, 2001.

[3]⬆ Although, according to Ferguson, appellant told Ted she and Ferguson only kissed, the Rule 202 Petition given to Ferguson listed as two areas of investigation: whether adultery existed as a fault ground for divorce and whether Ferguson violated the Texas Penal Code section regarding "deviate sexual intercourse."

disappointed, the emails had transpired during his and appellant's vacations,[4] and he felt betrayed by appellant because he had paid for these vacations at a time when he and appellant "were going to try to heal their relationship, and he felt very badly about that." Ted also told Ferguson his business had suffered because of the affair, and his children "were acting out." When Ferguson apologized, Ted responded that he "need[ed] to be made whole." Ferguson testified he "acknowledged that," and the two continued talking for another twenty to thirty minutes. The meeting ended with Ted telling Ferguson he would get back in touch with him "about wanting to be made whole."

Once back at his office, Ferguson opened the envelope, which also contained a letter from Ted to Ferguson that stated as follows:

> Enclosed are two items. The first is a summary of emails which demonstrates how my vacation was actually spent by my wife.
> The second is a petition pursuant to Rule 202 . . . which may assist you in determining the seriousness of your situation. It has not yet been filed, but in the words of my wife on October 16th, "Oh, my God, I can hardly wait."
> Be kind to yourself, Ted Roberts.

On December 10, 2001, Ferguson and Ted met again. Ted said he needed $30,000 to make himself whole, and Ferguson could either pay the amount to Ted "as trustee" of a children's foundation or Ferguson could pay the interest on Ted's mortgage for about six months. Ferguson gave Ted a check for $30,000 payable to "Ted H. Roberts, P.C., Trustee." Ted and Ferguson signed two confidentiality agreements. Ferguson had prepared one of the agreements for his signature and Ted's, while Ted had prepared the other agreement for his, Ferguson's, and appellant's signature. Ferguson testified he was not told that Ted was giving the same petitions to three other men, and he

---

[4] Ted and appellant were in California October 16 through October 23, 2001, during which time Ted attended a legal seminar.

did not know appellant had sexual relations with other men during this same time period. He did not recall appellant telling him he was "not the only one," instead, he recalled only that appellant told him Ted had discovered other emails from someone else. During direct examination, Ferguson testified as follows:

> Q. Would [appellant telling you about other men] have made a difference, knowing that information?
>
> A. Yes.
>
> Q. Tell us why.
>
> A. Well, I wouldn't have paid the money.
> . . .
> Because I would have felt that there was a pattern of behavior that didn't lend itself to Ted having a unique loss which would be – for which I was responsible.
> . . .
> Yes, I felt responsible, I felt guilty. I have kids of my own, so I felt very guilty about the acting out that he portrayed, as well as the counseling that they were having to go through he said.
> . . .
> [Knowing about the other men would have made a difference in deciding whether to pay Ted $30,000] because I would have felt that there was some kind of fraud involved at that point, since it was portrayed to me that I was the sole cause of the problems with his business and his wife and his children.

Ferguson said the documents contained in his packet, if made public, would have hurt his marriage and his business and would have exposed him to contempt. He also testified he was fraudulently induced to pay Ted because Ted gave him the impression that he alone was the cause of Ted and appellant's marriage problems. Ferguson did not know Ted and appellant had been in counseling for years before the events of 2001. He said that, during his November 28, 2001 meeting with appellant, appellant did not tell him she had delivered a letter and Rule 202 Petition to Stephen

Riebel on November 12, 2001. Ferguson said if he had known, he would not have paid Ted the $30,000.

About two weeks after Ferguson gave Ted the check for $30,000, appellant called Ferguson to tell him she and Ted were handling a personal injury lawsuit that "required a certain amount of financing or support for it to get to judgment." She asked Ferguson if he "want[ed] to make an investment" of an additional 30,000 "to support this litigation," which in turn would allow Ferguson to recover the $30,000 he paid to Ted. Ferguson said the offer made no sense to him and he did not pursue the offer.

Steven Riebel lived in San Antonio, was the chief financial officer for a pharmaceuticals firm in 2001, and his testimony for the State is as follows. When appellant responded to his on-line profile in either late August or early September 2001, they first met for coffee in San Antonio. Within a day or two, they met several times at a hotel in San Antonio or appellant's home and vehicle to have sexual relations. Their last sexual encounter was on October 24, 2001. On October 26, 2001, appellant called Riebel to tell him her husband had discovered their emails; Riebel told her he would consult an attorney. Riebel immediately told his wife about the affair. Appellant called him several more times, each time becoming "more graphic" in telling him that Ted was researching Riebel. In another telephone call, appellant told him Ted had prepared some papers and she asked if she could bring them to Riebel's office, rather than to the office of Riebel's attorney.

Enclosed in the packet was a hand-written letter dated November 12, 2001 from appellant to Riebel in which appellant stated as follows:

> Ted has promised to do nothing with the enclosed petition without first meeting and talking with you and your attorney. I don't know how much of the material you would want to share with [Riebel's attorney] or anyone else.

I urge you to contact either Ted . . . or me . . . soon so that this aspect of the entire ordeal will not be prolonged.

After reading the Rule 202 Petition contained in the packet delivered by appellant, Riebel felt Ted was "going after" him, Riebel was concerned about his public reputation, and he did not want his wife to be hurt. In a letter from Ted to Riebel's attorney, dated November 28, 2001, Ted listed various "out-of-pocket expenses," including the following: (1) $10,000 for a forensic computer investigation, (2) $5,690 for a "Ruined vacation to Sonoma," (3) a $5,000 retainer to Barbara Hutzler, an attorney, for managing Ted's practice, and (4) a $5,000 retainer to Sherry Gonzalez, an attorney, for assisting with Ted's practice. Ted provided receipts for some of the expenses, including an invoice for the computer investigation by Security Management International for $10,007.42. On December 6, 2001, Ted met with Riebel and his attorney, and told them he was considering starting a nonprofit organization to benefit children. At the meeting, Ted made it clear that if Riebel did not pay money to the nonprofit, he would file the petition the next day. Later in December 2001, Riebel purchased a cashier's check in the amount of $30,000 payable to "Ted and Mary Roberts," which was deposited into Ted's firm's operating account. On March 29, 2002, Riebel also paid $70,000 to the Roberts Foundation for Children. However, before paying the $70,000, Riebel and his attorney asked for proof that the foundation existed. Accordingly, attached to a hand-written note dated March 28, 2002, appellant provided Riebel with an affidavit on the foundation's tax exempt status and an amended confidentiality and settlement agreement. Appellant ended the note as follows: "Please accept my personal thanks for your assistance in this matter." Appellant, Ted, and Riebel all signed the confidentiality agreement. Riebel said neither Ted nor appellant told him other

men had received similar Rule 202 Petitions. Riebel believed he was the only person that caused Ted's damages.

Reagan Sakai, a corporate chief financial officer, testified for the State as follows. He first contacted appellant through her on-line profile and, after exchanging emails, they met sometime in late August 2001 at the Driskill Hotel in Austin, where they had sexual relations in appellant's room. Sakai said he knew appellant was married and had a child. After exchanging emails, appellant arranged for them to meet again in October 2001. However, while waiting for appellant at the hotel bar, a man approached Sakai, asked him a question about the stock performance of Sakai's company, and then identified himself as Ted Roberts. Ted gave Sakai an envelope, suggested he read the contents, and then he left. Sakai read the contents and believed it to be "some sort of legal lawsuit against" himself and appellant. Sakai felt a sense of "dread" because the suit named, as persons with an adverse interest, his wife and all the principals of his company.

After reading the Rule 202 Petition, Sakai went to the hotel's front desk and asked to speak to either Ted or appellant. When Ted answered, Sakai asked if they could discuss the matter. Ted and Sakai met again in the hotel lobby. Sakai testified the discussion was "a reaffirmation that he got me, he got me good, . . . the challenge was, Go ahead and research any of this and you will see that I have a legitimate claim." Sakai asked if there was any way to "settle" the matter, and Ted responded that he would "get back" to him. In a letter from Ted to Sakai, dated November 19, 2001, Ted stated, among other things, that Sakai (1) knew Ted and appellant were trying to "work things out in marriage counseling," (2) knew and exploited appellant's troubled marital history, and (3) knew appellant had been unfaithful. The letter ended by stating Ted had suffered as a result of

Sakai's actions and he intended to file the petition on December 21, 2001 unless Sakai paid him $15,000 "in damages" before that date. Sakai said the letter made him feel like "a pretty bad guy."

Sakai contacted an attorney who told him there was no merit to any of the claims listed in the petition, and "it wasn't geared towards winning a lawsuit, it was just a hodge-podge of legal ramblings . . . ." Sakai testified it did not matter to him whether the claims were legal ramblings, "[i]t all boiled down to, [Ted] was going to the courthouse and file this paperwork and also serve . . . my co-workers and wife and [appellant] as well." Although Sakai believed the petition was a "shake down," eventually an agreement was reached for Sakai to pay, by cashier's check, $10,000 payable to the Genesis Foundation for Children. The check was deposited into an account entitled Roberts Foundation for Children. Appellant, Ted, and Sakai all signed a confidentiality agreement. Sakai said he was not told others had received similar petitions.

Finally, Paul Fitzgerald, a certified public accountant, testified for the State. He first contacted appellant through her on-line profile and, after exchanging emails and telephone calls, they met sometime in late August in San Antonio for coffee. After a few other meetings, that did not involve anything beyond conversation and kissing, the two agreed to meet in late August 2001 at the Driskill Hotel in Austin, where they had sexual relations in appellant's room. About two weeks later, they met again in San Antonio, where they had sexual relations. Sometime in late October 2001, when Fitzgerald called appellant, she told him her husband had discovered their emails. Later, Fitzgerald was contacted by someone using the name "Dr. West" who said he wanted to discuss his income taxes with Fitzgerald. On either November 19 or 20, 2001, Ted showed up for the appointment, gave a packet of documents to Fitzgerald, and said he was "very distraught over the situation."

Upon reviewing the documents, including the Rule 202 Petition, Fitzgerald thought he had committed a crime, and if he was convicted of a felony, he would lose his license to practice as a CPA. He was also concerned that an examination of his computer files would reveal confidential client information that would ruin his business reputation. Ted told Fitzgerald there might be a way to avoid filing the petition and to "learn and grow and go forward from this." When Fitzgerald asked how that could be accomplished, Ted responded that Fitzgerald needed "to suffer" for what he had done and one way for him to suffer would be to help Ted "recover some of his expenses related to this matter." Ted initially quoted an amount of $25,000 and they agreed to $15,000. Ted instructed Fitzgerald to write three $5,000 checks, payable to Sherry Gonzalez, Security Management International, and Barbara Hutzler. In late November 2001, Fitzgerald gave the checks to Ted and he signed a confidentiality agreement, which included Ted's and appellant's signatures. Fitzgerald said Ted had a "large grin" on his face as he left, as if Ted was happy with himself. Fitzgerald said he was not aware that similar petitions had been given to other men. When he discovered later there were other men, he suspected a conspiracy between Ted and appellant.

Finally, Christie Trevino, the receptionist and a legal secretary at Ted's law firm, testified for the State. She testified she was the one who initially typed the petitions for Ted. She described Ted as mean, she said he often asked her to lie to appellant about where he was if appellant called the office, and he referred to appellant as a "bitch." Trevino said appellant and Ted had very little interaction between themselves when appellant was in the office and she did not believe they had a good marital relationship. However, Trevino said their relationship changed and "[o]nce all this came about, just all of a sudden they were much more, I guess, lovey-dovey, they just became a lot closer."

The State also presented evidence that a portion of the money paid by the men was used to pay closing costs on a new house purchased by Ted and appellant. Closing on the new house was scheduled for December 19, 2001; however, Ted and appellant were sued and an injunction froze their assets. As a result, appellant said they decided to take money in the form of a "loan" from the children's foundation, and use the money to cover their personal and law firm expenses. Some of the personal expenses included checks for $1,242 to a wine shop and $1,540 for a bed and breakfast in California. Although the civil lawsuit ended in November 2002 and Ted and appellant recovered $140,000 in the lawsuit, none of the "loans" were ever repaid and the foundation was dissolved in 2004. Ted and appellant eventually purchased a $625,000 home and a new vehicle in late 2001.

Appellant admitted that, although divorce from Ted was "still contemplated," she and Ted were in negotiations to buy the $625,000 house and she wrote a $10,000 earnest money check on November 25, 2001. She also testified she was not present at any of the meetings between Ted and the men, and she had nothing to do with the amount of money the men paid. She explained she delivered the petition and letter to Riebel because Ted did not want to have contact with an adverse party who might be represented by counsel; although she admitted Ted did not, in fact, know Riebel was represented by an attorney. She also said it was Riebel's attorney who wanted the $30,000 check to be payable to Ted and herself.

# I. SUFFICIENCY OF THE EVIDENCE

In several sub-issues under her first and second issues, appellant argues the evidence is legally and factually insufficient to support the jury's verdict.[5]

## A.    Criminal Culpability

According to appellant, causation and intent are elements of every crime and, here, the State failed to establish her culpability because it did not establish causation or her intent to commit theft.

### 1.    Causation

Appellant first contends her actions were not the type of acts that satisfy "but-for" causation as required by Texas Penal Code section 6.04(a), which provides as follows:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

TEX. PENAL CODE ANN. § 6.04(a) (Vernon 2003).

Under this section, two combinations may exist to satisfy the requisite causal connection between a defendant's conduct and the harm that followed: (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause; or (2)

---

[5] Appellant was convicted on five counts of theft by coercion or deception. A person commits the offense of theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE ANN. § 31.03(a) (Vernon 2003). "Appropriation of property is unlawful if . . . it is without the owner's effective consent . . . ." *Id.* § 31.03(b)(1). "'Effective consent' includes consent by a person legally authorized to act for the owner. Consent is not effective if . . . induced by deception or coercion . . . ." *Id.* § 31.01(3)(A). "'Deception' means: (A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; [or] (B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true . . . ." *Id.* § 31.01(1)(A), (B). "'Coercion' means a threat, however communicated . . . to expose a person to hatred, contempt, or ridicule [or] to harm the credit or business repute of any person . . . ." § 1.07(9)(D), (E).

the defendant's conduct and the other cause together may be sufficient to have caused the harm. *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). Appellant argues that her acts—typing revisions, delivering documents to one of the men, arranging a meeting with one of the men, and signing some of the settlement documents—are not sufficient to constitute "but for" causation. Therefore, appellant concludes that because her conduct was not sufficient by itself to have caused the harm (and there is no alleged concurrent cause), the evidence is legally insufficient to support the verdict.

We disagree with appellant's reliance on section 6.04(a) because Penal Code section 6.04 "relating to causation . . . has nothing to do with" a defendant's responsibility for the actions of another under Penal Code section 7.02. *Phillips v. State*, 770 S.W.2d 824, 826 (Tex. App.—El Paso 1988, no pet.). Evidence may support a conviction either on the theory of a defendant's guilt based on his or her own actions or based on a defendant's guilt because of his or her responsibility for the actions of another. *See* TEX. PENAL CODE ANN. § 7.01(a) (Vernon 2003) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."). Under section 7.02, "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."); *Id.* § 7.02(a)(2); *see also Otto v. State*, 95 S.W.3d 282, 284-85 (Tex. Crim. App. 2003) (affirming conviction as a party under section 7.02(a)(2), even though defendant not present at scene of crime). Therefore, appellant's first argument is without merit because the State could establish her guilt as a party upon proof, beyond a reasonable doubt, that she acted "with intent to promote or assist the commission of the offense"

of theft by deception or coercion and she solicited, encouraged, directed, aided, or attempted to aid Ted to commit the offense.

### 2. Intent

Appellant next asserts the evidence is legally insufficient to support a finding that she, acting with intent to promote or assist in the theft of the four complaining witnesses, solicited, encouraged, directed, aided, or attempted to aid Ted to commit theft.

Appellant points to testimony from her friends, neighbors, and acquaintances that she was a truthful and law-abiding person. According to appellant, based upon this character evidence alone no rational trier of fact could have believed beyond a reasonable doubt that she possessed the criminal intent to commit theft. Appellant also points to the testimony of one of the complainants that he did not believe appellant intended to steal, the testimony of another of the State's witnesses that appellant and her husband were "not on the same page"; and her own testimony that she would not do anything illegal. This argument ignores the standard of review appropriate to a legal sufficiency challenge, which requires this court to review the evidence in the light most favorable to the jury's verdict and to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005).

Moreover, the trier of fact may draw reasonable inferences and is the exclusive judge of the witnesses' credibility and the weight to give their testimony. *Jones v. State*, 944 S.W.2d 642, 647-49 (Tex. Crim. App. 1996). The jury heard undisputed evidence that appellant had sexual relations with the four complainants between August and late-October 2001; appellant typed revisions to some of the Rule 202 Petitions; each complainant received a Rule 202 Petition in November 2001; appellant

set-up meetings between Ted and some of the complainants; appellant and Ted purchased a new $625,000 home in late 2001; and between late November 2001 and late March 2002, the complainants paid $115,000 to Ted, Ted and appellant, or to a children's "charity." From this evidence, the jury could reasonably infer appellant, acting with intent to promote or assist in the theft of the four complaining witnesses, solicited, encouraged, directed, aided, or attempted to aid Ted to commit theft.

## B.     Law of Parties

Appellant argues she was found guilty on three counts under a legally inadequate or legally impossible theory because Ted was found not guilty on these same three counts. Appellant relies on case law holding that, to convict a person as a party, the State must first prove the guilt of another person as the primary actor beyond a reasonable doubt. *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993); *Pesina v. State*, 949 S.W.2d 374, 382 (Tex. App.—San Antonio 1997, no pet.). However, contrary to appellant's argument, the Penal Code provides as follows: "In a prosecution in which an actor's criminal responsibility is based on the conduct of another, the actor may be convicted on proof of commission of the offense and that he was a party to its commission, and *it is no defense . . . that the person for whose conduct the actor is criminally responsible has been acquitted*, has not been prosecuted or convicted, has been convicted of a different offense or of a different type or class of offense, or is immune from prosecution." TEX. PENAL CODE § 7.03(2) (emphasis added). Therefore, Ted's acquittal on three counts, alone, does not prevent appellant's conviction on these same counts. *See Ex parte Thompson,* 179 S.W.3d 549, 553 (Tex. Crim. App. 2005) (noting that "the acquittal of the principal does not prevent conviction of his accomplice"). "What matters under Section 7.02(a) [regarding criminal responsibility for another's conduct] is the

-16-

criminal *mens rea* of each accomplice; each may be convicted only of those crimes for which he had the requisite mental state." *Id.* at 554. Thus, what is essential to appellant's conviction of theft as a party under section 7.02(a)(2) is evidence that supports a finding, beyond a reasonable doubt, that she acted with intent to assist Ted in committing theft by deception or coercion. *See id.* at 555.

## C.      Deception and Coercion

Finally, appellant asserts that because she had no duty to disclose to each of the complainants that she had engaged in sexual relations with others and that Ted had drafted and presented Rule 202 Petitions to others, she did not engage in any deception. Appellant points to the Penal Code definition of "deception" to contend the Code creates only the following single duty to disclose, the violation of which gives rise to theft by deception: "selling or otherwise transferring or encumbering property *without disclosing* a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record . . . ." TEX. PENAL CODE § 31.01(1)(D) (emphasis added). This argument is without merit because it ignores the other definitions of "deception" contained in Penal Code section 31.01.

An actor commits the offense of "theft" if she "unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a). "Appropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.* § 31.03(b). "Consent is not effective if . . . induced by deception or coercion . . . ." *Id.* § 31.01(3). Here, the jury charge definition of "deception" tracked the Penal Code definition as follows: "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true; . . . or failing to correct a false impression of law or fact that

is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true." *Id.* § 31.01(1)(A),(B). Therefore, in a criminal prosecution for theft by deception, the State is not required to establish that the defendant had a duty to disclose. Instead, the State is required to establish that the defendant created or confirmed by words or conduct a false impression, or failed to correct a false impression, of law or fact that was likely to affect the property owner's judgment in the transaction.

## D.    Sufficiency of the Evidence

Based on our discussion above, we conclude the State was not required to establish a "but for" casual connection between appellant's conduct and the resulting harm. Instead, the State was required to establish, beyond a reasonable doubt, that appellant acted with intent to assist Ted in causing the theft by deception or coercion. With that in mind, we next review the sufficiency of the evidence in support of the verdict.

A legal sufficiency challenge requires this court to review the evidence in the light most favorable to the jury's verdict and to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State,* 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005). In a factual sufficiency review, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Id.* at 730-31.

"In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the

defendant which show an understanding and common design to do the prohibited act." *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994). Circumstantial evidence may be used to prove party status. *Id.* A defendant's intent may be inferred from her actions, words, conduct, and from circumstances under which the prohibited act occurs. *See Moore v. State*, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998); *Patrick v. State,* 906 S.W.2d 481, 487 (Tex. Crim. App. 1995).

Appellant asserts there is no evidence any of her statements to the complainants were deceptive. She relies on evidence that (1) she told one of the men he was "not the only one"; (2) she spoke several times to another of the men and there is no evidence she misled him in any matter they discussed; and (3) both checks written to the foundation were deposited into accounts belonging to the foundation pursuant to the settlement agreements and she was never charged with any crime regarding the foundation.

Between October 27 and November 11, 2001, appellant called Riebel several times, received a telephone call from Ferguson, and arranged the meeting at the Driskill with Sakai—all during the time in which Ted began drafting and appellant assisted in typing revisions to the Rule 202 Petitions. Appellant never told any of the men about the petitions given to the other men. The men were told the money would, in part, make Ted "whole." However, the evidence reveals the men all paid for some of the same "expenses." For example, the computer investigation cost $10,000, but Ferguson paid $10,000, Riebel paid $10,000, and Fitzgerald paid $5,000 to "compensate" for the cost of the investigation. Similarly, several of the men paid to "compensate" for the "ruined" California vacation. Appellant admitted she and Ted were in negotiations to buy a new house and they wrote an earnest money check on November 25, 2001—before appellant's November 28, 2001 meeting with Ferguson, before Riebel had the December 2001 cashier's check for $30,000 made payable to

appellant and Ted, and before Sakai purchased a check payable to the children's foundation for $10,000. The jury heard evidence that appellant and Ted experienced financial difficulties. Despite her assertions that she relied on Ted, the jury understood appellant was well-educated, and had a law degree, master's degree, and a real estate license, and she wrote almost every check out of the couple's personal account and the law firm's operating account. The jury also heard that, despite statements in the Rule 202 Petitions about divorce, Ted and appellant's relationship became more "lovey-dovey." From this evidence, the jury could infer that, after Ted discovered her affairs, appellant acted with intent to assist Ted in committing theft by deception.[6] Therefore, we conclude the evidence is legally and factually sufficient to support the jury's verdict.

## II. AFFIRMATIVE DEFENSE: MISTAKE OF LAW

In her third issue, appellant argues her conviction should be reversed because "the enormity of evidence proved [she] did not believe her conduct to be illegal."

"It is an affirmative defense to prosecution that the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon: (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or (2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question." TEX. PENAL CODE § 8.03(b). In this case,

---

[6] Appellant also asserts the State failed to prove coercion because the evidence proved she made no threat to expose a person to hatred, contempt, and ridicule, and by threatening to harm the credit and business repute of any person. Appellant was charged with the offense of theft, which includes appropriation without effective consent, by *either* deception or coercion. Accordingly, given a determination that legally and factually sufficient evidence exists to support a finding of theft by deception, we do not address appellant's sufficiency challenges to the alternative theory of deception by coercion.

the jury was instructed that it was an affirmative defense to prosecution if appellant "reasonably believed the conduct charged did not constitute a crime and that [appellant] acted in reasonable reliance upon: a written interpretation of the law contained in an opinion of a court of record." The jury also was instructed that "[p]ublished cases issued by any Texas Court of Appeals, the Texas Pattern Jury Charges, and the Texas Rules of Civil Procedure are each proper authority upon which reliance may be based." At trial, appellant bore both the burden of production of evidence and the burden of persuasion for her affirmative defense. *Roberts v. State*, 278 S.W.3d 778, 794 (Tex. App.—San Antonio 2008, pet. ref'd).

Appellant testified she was familiar with Rule 202 and believed it was a legitimate vehicle to investigate claims prior to filing suit. In support of this argument, appellant offered the testimony of an expert who testified a lawyer does not have to decide whether he or she actually has a claim before serving a Rule 202 petition, and such a petition is a valid legal mechanism to investigate a claim. Although there was no dispute at trial that Rule 202 petitions are legitimate mechanisms to investigate a claim, the jury was free to accept the State's argument that Ted and appellant's *use* of the petitions under the circumstances presented here amounted to a "shake down" for "hush money"; thereby rejecting appellant's argument that she believed her and Ted's use of the petitions was legal.

### III.  CHARGE ERROR

In several sub-issues, appellant complains about the jury charge.

### A.    Counts II, IV, and V

Appellant contends the trial court erred by including these three counts in the jury charge. This argument is not well-developed, but it appears to be related to her argument above that she was found guilty on three counts under a legally inadequate or legally impossible theory because Ted was

found not guilty on these same three counts. For the reasons stated above under our discussion of Law of Parties, we conclude the court did not err in including these counts in the charge.

**B.      Duty to Disclose**

Appellant next asserts the trial court erred by not first making a determination of whether, as a matter of law, she had a duty to disclose before instructing the jury on the definition of deception. Appellant also contends the trial court erred in denying her requested instruction that she had no duty to disclose. For the reasons stated above in our discussion of Deception and Coercion, we conclude the trial court was not obligated to make such a determination and the trial court did not err in denying her requested instruction.

**C.      Law of Parties**

Appellant asserts the trial court erred in denying her the following requested instruction concerning the law of parties:

> In order to convict Mary Roberts under the law of parties, the State must prove to you beyond a reasonable doubt that, at the time of the alleged offense, Mary and Ted Roberts were acting together, each contributing some part toward the execution of their common purpose, and that Mary Roberts acted with the intent to promote or assist in the commission she knew to be a criminal offense. That is, in order to establish Mary Roberts' liability as a party to the alleged crime, the State has the burden to prove, beyond a reasonable doubt that, in addition to the alleged illegal conduct of Ted Roberts, Mary Roberts acted with specific intent to promote or assist the commission of the crime.
>
> Additionally, the State must prove that any agreement between Ted and Mary Roberts to commit a crime, if any, must have been made before or contemporaneously with the alleged criminal event.
>
> Evidence that shows only deception after the time period alleged in the indictment is legally insufficient to establish criminal intent.
>
> Therefore, proof that Mary Roberts assisted Ted Roberts after an alleged crime was committed, standing alone is insufficient to support Mary Roberts' conviction as a party, and you shall acquit the defendant.

On appeal, appellant contends the jury lacked any guidance on how to evaluate her intent and the jury was unaware that she had to intend for Ted to commit theft. As a result, appellant concludes the trial court's failure to include her requested charge undercut her defense that she did not want Ted to approach the men with the Rule 202 Petitions, and she did not intend to commit a crime or allow Ted to commit a crime.

A trial court has a duty to prepare a jury charge that accurately sets out the law applicable to the specific offense charged. *Delgado v. State,* 235 S.W.3d 244, 249 (Tex. Crim. App. 2007); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007). "Specifically requested charges may be refused where the instructions given by the court are adequate and fully protect the rights of the accused." *Tovar v. State*, 165 S.W.3d 785, 792 (Tex. App.—San Antonio 2005, no pet.). Here, the jury charge included the following instruction:

> Our law provides a person is criminally responsible as a party to an offense if the offense is committed by her own conduct, or by the conduct of another for which she is criminally responsible, or both. Each party to an offense may be charged with the commission of the offense.
>
> Mere presence alone will not make a person a party to an offense. A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense she solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

The charge defined when a person "acts intentionally, or with intent," and each count included the party allegation: "[appellant], either acting alone or together with Ted Roberts as a party . . . ."

We hold there is no error because the jury charge correctly tracked Penal Code sections 6.03(a) ("Definitions of Culpable Mental States," including when a person acts intentionally or with intent), 7.01 ("Parties to Offense"), and 7.02 ("Criminal Responsibility for Conduct of Another").

*See Tovar*, 165 S.W.3d at 792 (holding that because charge given to jury properly placed burden on the State to prove defendant's mens rea as required by relevant statutes and charge tracked language of relevant statutes, instructions adequately and fully protected defendant's rights).

**D.     Third Parties**

Appellant asserts the trial court erred in denying her the following requested instruction relating to suits against third persons:

> You have also heard evidence concerning potential causes of action that can be filed in Texas state courts. It is the law in Texas that a spouse may, in some circumstances involving adultery, bring a cause of action for intentional infliction of emotional distress against the offending spouse and against a third party based on interference with the marriage relationship.

Appellant argues that, although alienation of affection and criminal conversation have both been abolished by the Texas Legislature as causes of action, the absence of these common law causes of action did not deprive Ted of other avenues of relief. Therefore, appellant concludes that denying her the requested instruction left the jury with the impression Ted had no reasonable basis to believe the Rule 202 Petitions would have any benefit other than to serve as a "shake down" of the men with whom appellant had been involved. This, according to appellant, directly affected her mistake of law defense, as well as her defense that what Ted did with the petitions was legal.

The State did not dispute that Rule 202 petitions are legitimate pleadings to pursue legitimate claims. Appellant received an instruction on her affirmative defense of mistake of law, which provided, in part, as follows: "You are instructed that it is an affirmative defense to a prosecution for a crime that the defendant reasonably believed the conduct charged did not constitute a crime and that the defendant acted in reasonable reliance upon: a written interpretation of the law contained in an opinion of a court of record." This instruction allowed appellant to argue that the petitions here

were used to "bring a cause of action for intentional infliction of emotional distress against the offending spouse and against a third party based on interference with the marriage relationship" — an argument she did not make. Because the instruction given on the affirmative defense tracked Penal Code section 8.03(b) ("Mistake of Law") and, therefore, adequately protected appellant's rights, the trial court did not err in refusing the requested instruction.

## IV. MOTION TO QUASH INDICTMENT

Appellant asserts the trial court erred in denying her motion to quash the indictment on the grounds that it failed to allege conduct or facts that constituted an offense. Appellant concedes the indictment tracked the language of the theft statute, but she contends the indictment alleged nothing more than the names of the complainants and a range of dates on which she purportedly committed theft by deception or coercion. She alleges that by not indicating the acts the State believed constituted theft by deception or coercion—delivering a petition, signing confidentiality agreements, setting up a meeting, sharing in profits, and not fully disclosing the existence of other men—she was unable to adequately prepare her defense.

A criminal defendant has a constitutional right to notice. *Lawrence v. State*, 240 S.W.3d 912, 916 (Tex. Crim. App. 2007). To satisfy this notice requirement, an indictment must be specific enough to inform the defendant of the nature of the accusation against her so that she may prepare a defense. *Id.* "An indictment is generally sufficient as long as it tracks the language of a penal statute that itself satisfies the constitutional requirement of notice." *Id.* An indictment is sufficient if it sets forth the offense in "plain and intelligible words." TEX. CODE CRIM. PROC. ANN. art. 21.02.7 (Vernon 2009). And, "[e]verything should be stated in an indictment which is necessary to be proved." *Id.* art. 21.03.

A similar complaint was addressed and rejected by a panel of this court in the appeal arising from the conviction of Ted Roberts for theft. *See Roberts*, 278 S.W.3d at 791-92. In his appeal from his conviction, Ted argued the indictment failed to allege conduct or facts constituting an offense because the indictment failed to provide adequate notice of what facts constituted criminal conduct, and instead merely tracked the language of the statute and provided the names of the complainants. Here, as in that case, the indictment charged appellant with theft by deception and theft by coercion, tracking the language of Penal Code section 31.03(a) and detailing the statutory definitions of "coercion" and "deception" appellant was charged with violating. We conclude the indictment in this case provided appellant with notice that was specific enough to allow her to investigate the allegations against her and establish a defense. "By providing [appellant] with the names of the complainants [and the range of dates] and charging [appellant] with the specific definitions of 'coercion' and 'deception' [she] allegedly violated, [appellant] was sufficiently informed of the specific actions that allegedly violated the statute.' *See id.* at 792. Moreover, the additional facts appellant argues should have been included in the indictment relate to evidentiary facts the State is not required to allege in the indictment. *Id.* Also, requiring an indictment to list each specific act would require the State to "lay out its case in the indictment," which it is not required to do. *Id.* (quoting *State v. Moff*, 154 S.W.3d 599, 603 (2004)).

## V. CONSTITUTIONALITY OF THEFT STATUTE

In her final issue on appeal, appellant asserts the theft statute is vague and overly broad both on its face and as applied. In *Roberts*, a panel of this court held the theft statute was neither unconstitutionally over broad or vague on its face, and we follow the holding in that case. *Roberts*, 278 S.W.3d at 790-91. As to appellant's argument regarding whether the statute is unconstitutional

as applied to her, it was appellant's burden to prove the statute is unconstitutional as applied *to her specific conduct*. *See Flores v. State*, 33 S.W.3d 907, 920 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Appellant's only argument is that she "was indicted for theft, when Christie Trevino, who engaged in the same conduct as [appellant] was not indicted, and indeed, was called as [a] witness for the State." Arguing that another individual also could have been charged with the same offense does not establish how the statute is unconstitutional as to appellant's conduct. We conclude appellant has not demonstrated the statute is unconstitutional as applied to her.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Publish