

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00710-CR

Lizette **DELUNA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2015CR3555A
Honorable Steve Hilbig, Judge Presiding

Opinion by:     Sandee Bryan Marion, Chief Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Marialyn Barnard, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed:  June 15, 2016

AFFIRMED

A jury found appellant, Lizette DeLuna, guilty of trafficking of a child and compelling prostitution of a child, and the trial court assessed punishment at concurrent sentences of fifteen years' confinement and a $2,000.00 fine for each conviction. On appeal, appellant challenges the sufficiency of the evidence in support of the jury's verdict and alleges her trial counsel was ineffective. We affirm.

## BACKGROUND

The complainant, J.T., was seventeen years old at the time of trial. She testified she was born and raised in New Zealand, and immigrated to the United States in 2012. In 2013, when she was either fourteen or fifteen years old, she moved from Houston to San Antonio to live with her mother and step-father. At this time, she met an eighteen-year-old woman by the name of Kiki. J.T. said she never told Kiki her age. She also said she did not have a car or a job, and after three months in the United States, her visa expired.

At some point, Kiki moved in with J.T. and her family, and they lived together for about three months. During this time, while they were out for a walk, Kiki and J.T. stopped to speak to a group of people, one of whom was a man known as Red Nose. Later that same day, Red Nose, Kiki, and J.T. went to a Fiesta Inn where they stayed overnight. J.T. stated Red Nose wanted her to post an ad on Backpage, an internet site for escorts. She said she did not place the ad because doing so required a credit card or gift card. When asked if she knew the purpose of the ad, J.T. responded

> No. Kiki had told him about my immigration and how much it was going to be to get my papers. And he told her that there's easy ways to get it, and it's fast. And so she told me. And then we were going to the room, and I wasn't feeling it. They ended up having sex. We [her and Kiki] ended up going home.

J.T. testified that a few days later, Kiki introduced her to appellant. J.T. explained

> . . . Kiki was talking about wanting to make some money, too, and — but she didn't want to do the extra stuff. She just wanted to do what Red Nose does. And I had asked her, Who do you know that is going to do that? And she says [appellant]. So [Kiki] introduced me to [appellant]. We had gone to [appellant's] house, and [Kiki] introduced me to [appellant]. We spoke to [appellant], and we had come up with a deal that half of her money would go to Kiki, half of her money would go to Red Nose.

On cross-examination, J.T. clarified what she meant. According to J.T., Kiki decided she wanted to start making money and she needed to find someone "that she could put to work," which

is when J.T. and Kiki went to appellant's house. J.T. said the purpose of the visit was to talk to appellant about prostituting appellant on Backpage.

According to J.T., although Kiki was working on the details of making money with appellant, she [J.T.] did not agree to participate. J.T. said she was sixteen years old at this time, and had never engaged in prostitution.

A few days later, Red Nose and another woman named Stephanie drove to J.T.'s house to pick up Kiki and J.T. J.T. said they all drove to the Fiesta Inn where J.T. thought they would go swimming and just have fun. J.T. said she did not want to go to the Fiesta Inn, but Kiki persuaded her to come by telling her that Red Nose would beat Kiki up. Once at the Fiesta Inn, J.T. said they changed clothes and went swimming. J.T. said that while they were swimming,

> Red Nose comes out and he tells me that there's a client on the way. I get out. I go up to him. He tells me that, and I tell him I'm cool. I'm all right. I go back into the pool and [Kiki] tells me that I should go do it.
>
> . . .
>
> I had asked them to give me a time frame of when the client was going to be there. They had said like 30 minutes. So after 30 minutes, I go into the room and I had one of the clients knock on the door.

J.T. said she gave the client a "hand job," and collected $120.00. Although she was supposed to give Red Nose half of the money, he let her keep the $120.00 so that she could get a room of her own because appellant "felt like she had paid for the room, that we shouldn't be in there, that we were being disrespectful." Kiki and J.T. used the money to get their own room at the Fiesta Inn while appellant and Red Nose shared a room. After spending one night and two days at the Fiesta Inn, everyone moved to the Super 8 motel. J.T. said they all took a taxi from the Fiesta Inn to the Super 8. Again, J.T. and Kiki got one room, and appellant and Red Nose got another room. Red Nose paid for a portion of the cost of appellant's and Kiki's room.

While at the Super 8, J.T. had one client who was originally to meet with appellant, but appellant had her "period" and asked J.T. to meet the client instead. J.T. explained appellant

answered telephone calls from clients and would tell J.T. whether she had a client.  When asked who negotiated the rates the clients paid, J.T. said, "those were the rates that [appellant] and Red Nose were doing.  They didn't want to change it, apparently."  She answered "yes" when asked if she knew before "she even got into this that [appellant] was dealing with [Red Nose] at these rates."  J.T. said her alias was "Megan" and she did not know if appellant used a different name.

J.T. testified that Red Nose took out an ad in Backpage and used photos of her to solicit clients.  Some of the photos of J.T. were copied from J.T.'s Facebook page, one was taken by J.T. using Red Nose's telephone, and another photo was taken by appellant using Red Nose's telephone.  When J.T. had a client, Kiki would go outside with Red Nose.  J.T. said she was concerned about being in a room with a strange man, but she knew Red Nose would not allow anything to happen to her or appellant who was also taking clients.  J.T. said that in the one day she spent at the Super 8, she had two clients.  J.T. said she was paid $150.00 and $120.00, half of which she gave to Kiki, who in turn gave the money to Red Nose.  J.T. said she spent her half of the money buying things for Kiki.  J.T. stated that the next day, she, Red Nose, appellant, and Kiki went to a Motel 6 by taxi arranged for by Red Nose.  Again, Kiki and J.T. shared one room, and appellant and Red Nose shared another room.  On the second day at the Motel 6, J.T. said she had three clients.  When asked whether, during the several days she was at various motels, anyone gave her instructions on how she should behave, J.T. responded that while at the Fiesta Inn

> [Appellant] did that.  She had given me an example of how to welcome a client into the room.  When they come in, you ask them to put — they either give you the money in your hand or they're going to put it on the dresser.  And you just got to be happy and act like you really want them there.

J.T. said the last of her three clients at the Motel 6 turned out to be an undercover police officer.  She said other police officers came into the room and asked her how old she was, and she

responded "16 and everything changed" because they could not take her to jail. Instead, a detective took J.T. back to her house.

J.T. testified that during the time she was away from home, her mother knew she was with Kiki, whom she trusted. She said she did not have a telephone and Kiki would not let her use Kiki's phone. J.T. said that, unbeknownst to her, Kiki told her mother that J.T. was in Houston. J.T. stated that after she returned home and later discovered she was pregnant, her mother pushed her on her stomach and tried to throw J.T. and J.T.'s boyfriend out of the house, her step-father hit her, and her boyfriend then beat her step-father. J.T. said her mother called the police and both she and her boyfriend were incarcerated for two weeks. When she returned to her house, it was empty and her clothes were in a suitcase at the side of the house. J.T. said she tried to call her mother, but her mother had changed telephone numbers and she has not spoken to her mother since. J.T. said she has no other family in the United States. She said she is facing criminal charges for bodily injury and criminal mischief. J.T. stated she was represented by counsel in the criminal proceedings against her, and she had not been offered any deal in exchange for her testimony at appellant's trial.

Detective George Segura, a San Antonio VICE officer, testified he was called to the Motel 6 after undercover VICE officers discovered J.T. acting as a prostitute and that she was a minor. Detective Segura said there were two people "recovered" at the scene (J.T. and Kiki), and two other people who were not at the scene (Red Nose and appellant) were considered suspects. After speaking briefly with J.T. and Kiki, Detective Segura brought both girls to the home of J.T.'s mother. Detective Segura said J.T. was sixteen years old at the time of her prostitution, and appellant was in her twenties. Based on his investigation, Detective Segura filed three cases for trafficking a person under the age of eighteen with the District Attorney's Office: one against Gerald Rathey, aka Red Nose; one against Kiki; and one against appellant. Detective Segura

explained how one placed an ad on Backpage, and he said it was uncommon for a male to answer the telephone number placed in the ad.

A jury found appellant guilty on one count of trafficking, not guilty on a second count of trafficking, and guilty of compelling prostitution.

## SUFFICIENCY OF THE EVIDENCE

Appellant asserts there is no evidence she "trafficked" a child or compelled prostitution of a child. Appellant also asserts the trial court failed to properly apply the rule of parties.

### A. Applicable Law and Standard of Review

A person commits the offense of trafficking a child if the person knowingly "traffics a child and by any means causes the trafficked child to engage in, or become the victim of, conduct prohibited by . . . (C) Section 22.011 (Sexual Assault) [or] (E) Section 43.02 (Prostitution) . . . ." TEX. PENAL CODE ANN. § 20A.02(a)(7)(C),(E) (West Supp. 2015). A person commits the offense of compelling prostitution if the person knowingly "causes by any means a child younger than 18 years to commit prostitution, regardless of whether the actor knows the age of the child at the time the actor commits the offense." *Id.* § 43.05(a)(2). The jury was instructed that a person is criminally responsible as a party to an offense if the offense is committed by her own conduct, or by the conduct of another for which she is criminally responsible, or both. *Id.* § 7.01(a) (West 2011). The jury was instructed that a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

When reviewing the legal sufficiency of the evidence to support a criminal conviction, we review the evidence in the light most favorable to the verdict to determine whether a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012); *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). Under the *Jackson* standard, we are required to defer to the jury's determination of the credibility of witnesses "and the weight to be given their testimony." *Brooks*, 323 S.W.3d at 899. Circumstantial evidence is as probative as direct evidence, and alone, may be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). A jury is permitted to draw multiple reasonable inferences from the facts so long as the inferences are supported by the evidence presented at trial. *Merritt*, 368 S.W.3d at 525. We do not ask whether we believe the evidence at trial established guilt beyond a reasonable doubt, instead, we consider only whether the jury reached a rational decision. *Brooks*, 323 S.W.3d at 899.

## B. Application and Analysis

On appeal, appellant asserts the evidence is insufficient to support the trafficking conviction on three grounds. First, appellant contends the only evidence the State presented regarding trafficking a minor was that appellant, J.T., Kiki, and Red Nose all rode in a taxi on June 10, 2014, not on June 11, 2014. Second, appellant contends J.T. never discussed her age with appellant, nor did appellant know J.T.'s age; therefore, the State failed to produce any evidence that "the persons actually committing [sexual] assault were more than three years older than" J.T. Third, appellant contends the State failed to produce any evidence that appellant caused J.T. to engage in prostitution because, based on J.T.'s own testimony, appellant was already present at the Fiesta Inn and appellant did not know J.T. would be joining them on June 9 or 11, 2014.

As to the compelling prostitution of a child conviction, appellant asserts the evidence is insufficient on two grounds. First, appellant contends the State failed to prove appellant caused

J.T. to commit prostitution by the use of force, threat, or fraud because the only evidence presented was that Kiki told J.T. that if J.T. did not come to the hotel with her then Red Nose would beat both of them. Second, appellant contends the State failed to prove causation because there is no evidence appellant provided J.T. with an opportunity to engage in prostitution. Appellant contends the record establishes only that Red Nose and Kiki used threats and provided an opportunity to engage in prostitution when Red Nose and Kiki transported J.T. to the Fiesta Inn.

Finally, appellant asserts the trial court misapplied the law of parties because the State failed to produce sufficient evidence that appellant was criminally responsible for the conduct of another, or that she acted with the intent to promote or assist the commission of an offense. Again, appellant points to Red Nose and Kiki as being solely responsible for J.T.'s conduct. According to appellant, the State could only show that appellant was forced to cooperate with Kiki and Red Nose by reserving her own rooms, answering Red Nose's telephone, and calling for taxi cabs.

In this case, the State had to prove appellant knowingly trafficked J.T., and by any means caused J.T. to engage in or become a victim of sexual assault or prostitution on or about June 11, 2014. TEX. PENAL CODE § 20A.02(a)(7)(C),(E). The Penal Code's definition of "traffic" includes more than transporting a complainant. The Penal Code defines "traffic" as "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id.* § 20A.01(4). The State also had to prove appellant knowingly caused, by any means, J.T. to commit prostitution. *Id.* § 43.05(a)(2). A person commits the offenses of trafficking of a child and compelling prostitution of a child "regardless of whether the [person] knows the age of the child at the time the [person] commits the offense." *See id.* §§ 20A.02(b)(1); 43.05(a)(2). Finally, under the law of parties, the State had to show appellant, acting with intent to promote or assist the commission of an offense, solicited, encouraged, directed, aided, or attempted to aid another person to commit the offense.

Although a minor may be "trafficked" in more than one manner, on appeal, appellant focuses her argument only on the one taxi ride, arguing they simply all rode together in one taxi. However, records from the taxi cab company indicated that on June 9, 2014, appellant called for the taxi. Also, the definition of "traffic" includes to entice or recruit, two words not defined in the Penal Code and which do not possess a technical meaning; thus, they may be given their common meanings. *Medford v. State*, 13 S.W.3d 769, 771-72 (Tex. Crim. App. 2000) ("terms not legislatively defined [and without possessing a technical meaning] are typically to be understood as ordinary usage allows, and jurors may thus give them any meaning which is acceptable in common parlance"); *see also Clinton v. State*, 354 S.W.3d 795, 800 (Tex. Crim. App. 2011) (internal citation omitted) ("When analyzing the sufficiency of the evidence, undefined statutory terms 'are to be understood as ordinary usage allows, and jurors may thus freely read statutory language to have any meaning which is acceptable in common parlance.'"). The common meaning of "entice" includes to "draw on by arousing hope or desire," "allure," "draw into evil ways," "lead astray," and "tempt." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 757 (2002). The common meaning of "recruit" includes to "hire or otherwise obtain [a person] to perform services," and "secure services of [a person]." *Id.* at 1899.

The jury heard the following evidence regarding appellant's conduct. The first hotel room in which J.T. engaged in prostitution was appellant's room. Appellant asked J.T. to take a client at the Super 8 because appellant had her "period." Appellant took one of the photographs of J.T. and used it in the Backpage ad. Appellant instructed J.T. how to welcome a client into the room, how to take the money from the client, and that she should be "happy and act like you really want them there." Appellant would call J.T.'s room to tell her whether J.T. had a client. Detective Segura testified it was uncommon for a male to take calls from clients responding to Backpage ads.

From this evidence, the jury could have reasonably inferred that appellant "trafficked" J.T. by enticing or recruiting J.T. into engaging in prostitution. Likewise, the jury could have reasonably inferred appellant compelled J.T. to engage in prostitution. Contrary to appellant's argument, there is no requirement that force, threat, or fraud be used to commit the offense of compelling a child to commit prostitution. *See* TEX. PENAL CODE § 43.05(a)(2). The State was required only to show appellant "cause[d] by any means" a child to commit prostitution. *Id.* On appeal, appellant contends the State failed to show causation under Penal Code section 6.04.

"A person is criminally responsible if the result would not have occurred *but for* his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PEN. CODE § 6.04(a) (emphasis added). However, "section 6.04 'relating to causation . . . has nothing to do with' a defendant's responsibility for the actions of another under Penal Code section 7.02." *Roberts v. State*, 319 S.W.3d 37, 47 (Tex. App.—San Antonio 2010, pet. ref'd) (quoting *Phillips v. State*, 770 S.W.2d 824, 826 (Tex. App.—El Paso 1988, no pet.)). "Evidence may support a conviction either on the theory of a defendant's guilt based on his or her own actions or based on a defendant's guilt because of his or her responsibility for the actions of another." *Id.* (citing to TEX. PENAL CODE § 7.01(a)). Therefore, appellant's argument on causation is without merit because the State could establish her guilt as a party upon proof, beyond a reasonable doubt, that she acted "with intent to promote or assist the commission of the offense" of compelling prostitution and she solicited, encouraged, directed, aided, or attempted to aid Red Nose to commit the offense. Although there is no dispute in this appeal that Red Nose promoted J.T.'s prostitution, the jury could have reasonably inferred from the evidence that appellant, acting with intent to promote or assist the commission of the offenses of trafficking a minor and compelling

prostitution, solicited, encouraged, directed, aided, or attempted to aid Red Nose to commit the offenses.

We conclude a rational jury could have found the essential elements of both offenses beyond a reasonable doubt.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant asserts her trial counsel was ineffective in three areas. First, appellant contends counsel failed to object to extraneous actions occurring on June 8 and 10 of 2014 because the indictment alleged wrongful conduct on only June 9 and 11 of 2014. Second, appellant asserts counsel failed to "highlight" the ongoing sexual relationship between Kiki and Red Nose, and instead, allowed the State to introduce evidence that appellant and Red Nose had a sexual relationship. According to appellant, the evidence of her relationship with Red Nose strengthened the State's case that she was a party to the criminal acts. Third, appellant asserts counsel failed to "highlight" J.T.'s conflict of interest based on her illegal stay in the United States and her pending criminal charges of causing bodily injury and criminal mischief. According to appellant, counsel should have told the jury J.T. had every reason to cooperate with the State to avoid the consequences of her own actions.

To prevail on a claim of ineffective assistance of counsel, the defendant must show: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, the defendant must prove by a preponderance of the evidence that her attorney's representation "fell below the standard of professional norms." *Garza v. State*, 213 S.W.3d 338, 347-48 (Tex. Crim. App. 2007). "To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 348. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

We "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance." *Id.* at 689. "To defeat the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (internal citations omitted). In this case, appellant did not file a motion for new trial nor was any hearing held at which a record on trial counsel's strategy could be developed. Therefore, we are faced with a silent record. "When the record is silent as to counsel's reasons for his conduct, finding counsel ineffective would call for speculation by the appellate court, [and] [a]n appellate court will not speculate about the reasons underlying defense counsel's decisions." *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). "If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief." *Ruiz v. State*, 293 S.W.3d 685, 691 (Tex. App.—San Antonio 2009, pet. ref'd). The presumption prevails because "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). "Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Appellant contends counsel was ineffective because he did not object to extraneous conduct. Appellant provides no citation to the record for the complained-of conduct and the record is silent regarding the reasons underlying counsel's actions; therefore, appellant has not defeated the presumption of reasonable professional assistance.

Next, appellant contends counsel should have "highlighted" the sexual relationship between Red Nose and Kiki. Appellant does not explain how counsel should have "highlighted" this relationship, nor does appellant provide any citation to the record regarding the relationship between Red Nose and Kiki. Therefore, appellant has not defeated the presumption of reasonable professional assistance.

Finally, appellant contends counsel should have undermined J.T.'s credibility by challenging her motive to cooperate with the State. It appears, however, that counsel's strategy was not to discredit the victim—J.T.—but to portray appellant as another victim of Red Nose and Kiki's prostitution operation. During opening arguments, defense counsel argued that Red Nose (the pimp) and Kiki (his money collector) were the people responsible for prostituting both J.T. and appellant. In closing arguments, defense counsel again pointed to Kiki as the person who first got J.T. involved with Red Nose, and Kiki approached appellant about prostituting herself for Red Nose so that Kiki could earn extra money. Counsel argued appellant was not present for much of the conversations about Backpage and how the money would be split. Counsel pointed out to the jury that none of the money earned by J.T. went to appellant. Counsel closed by asking the jury not to make appellant's situation worse because she had already been victimized by Red Nose. On this record, we cannot say counsel's declining to challenge J.T. was so outrageous that no competent attorney would have done the same.

We conclude appellant has failed to prove by a preponderance of the evidence that trial counsel's representation fell below the standard of professional norms.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Chief Justice

Do not publish